Dennis J. WILKERSON, Appellant,

v.

Linett M. WILKERSON, Appellee.

No. 01–09–00319–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

June 3, 2010.

Rehearing Overruled Aug. 5, 2010.

Alene R. Levy, Casey T. Wallace, Lynne Liberato, Mark Ryan Trachtenberg, Michael T. Powell, Haynes & Boone, L.L.P., Houston, TX, for Appellant.

Pamela C. Hicks, William L. Maynard, Beirne Maynard & Parsons, L.L.P., Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, HIGLEY, and SHARP.

## OPINION

LAURA CARTER HIGLEY, Justice.

Appellant, Dennis J. Wilkerson, challenges the trial court's order granting appellee, Linett M. Wilkerson's, application for a family violence protective order under section 82.002 of the Texas Family Code. *See* TEX. FAM.CODE ANN. § 82.002 (Vernon 2008). In four issues, Dennis asserts that this case is not an "appropriate case" for the issuance of a family violence protective order, the trial court's family violence protective order "is based on argument, innuendo, and inadmissible evidence," and there is legally insufficient evidence to support the trial court's findings that family violence occurred in the past and is likely to occur in the future.

We affirm.

### Factual and Procedural Background

Linett is the third wife of James H. Wilkerson (Jim), who died on November 11, 2003. Dennis is Jim's son from his first marriage. In September 2004, Linett sued Dennis, asserting claims against him for breach of fiduciary duty and fraud "relating [to] the mismanagement and con-

version of partnership and corporate assets of various family-owned entities." In February 2009, Linett, the executor of Jim's estate and the trustee of trusts for their four children, filed her application for a family violence protective order against Dennis alleging that he, in "an attempt to coerce" her into abandoning her underlying lawsuit, had made threats of bodily injury and death against her and her and Jim's four children, Rushton, Jarod, Andriel, and Loriel. Linett attached to her application her affidavit in which she described threats made by Dennis toward her and her children as well as threats made by Robert Lee "Buddy" Williams, who Linett described as Dennis's friend and business associate.

Dennis filed an answer, generally denying Linett's allegations, and Dennis filed a competing application for injunctive relief. Dennis stated that the underlying lawsuit involved a complex dispute regarding the ownership and valuation of various family-owned entities. Dennis alleged that he had been business partners with his father Jim in a number of successful entities and that, following Jim's death, Linett began threatening and harassing him and other employees of these entities. Dennis also asserted counterclaims for invasion of privacy and defamation.[1]

The trial court conducted a two-day hearing on Linett's application. At the hearing, Linett testified that she had been married to Jim for sixteen years until Jim's death from cancer in late 2003. Linett explained that Jim had been diagnosed with cancer in 1996 and that she had served as Jim's caretaker during his illness. Linett and Jim had four children together, ranging in ages from 10 to 14, at the time of Jim's death.

Shortly after Jim's death, Dennis came to her house to ask about her future plans. When Linett explained to Dennis that she intended to learn about the family businesses, Dennis became furious and told Linett that she had "no business" in one of the businesses, the Augusta Pines golf course. Dennis then instructed Linett to follow him to the gazebo outside, where Dennis told Linett that he ran the business. He told her that he was "a good shot," grabbed some cans from a refrigerator in the gazebo, tossed them on the ground, pulled out a gun, and shot each of the cans. He then told Linett, "I never miss." Linett was trembling and felt threatened, and she felt Dennis was capable of causing bodily harm to her and her children. Dennis then instructed Linett to follow him to his truck, showed her ammunition in his glove compartment, and said, "See, I always have plenty of ammunition." Linnet went to her room and began crying, but did not call the police, explaining that it was not her nature to get law enforcement authorities involved, that this was her husband's son, and that she was trying to prevent her children from learning that they had "a violent brother." Linett stated, however, that she subsequently hired a private investigator, Bill Young, for safety reasons. She also testified that, after the shooting incident, she no longer allowed Dennis on the premises.

Linett further testified that in January 2004, she began working at Augusta Pines on a frequent basis to become involved in the businesses. As executor of Jim's estate, Linett hired accountants to gather necessary financial information to probate the estate and to audit the family-owned entities. At one point, Dennis called a meeting and told Linett that she was not to "get in his way," she had to ask him

---

1. The trial court denied Dennis's application for injunctive relief, and that ruling is not at issue in this appeal, nor are any of the other claims.

first if she needed anything, that he would steal, cheat, and lie to get his way, and if she got in his way "something would happen" to her. Linett stated that Dennis threatened her with bodily injury over nine times while at Augusta Pines. In September 2004, after Dennis had refused her attempts to obtain financial information, she filed the underlying lawsuit.

After Linett filed the lawsuit, Williams, Dennis's friend, came to her house twice regarding the lawsuit. During the second visit, Linett testified that Williams told her that Dennis had sent him to make her an offer of $4 million to never return to Augusta Pines and to let Dennis run the business. During this visit, Williams told her, "You do realize anything can happen to you? You can disappear and nobody will know. We can take your children hunting and there can be an accident and nobody will know what happened." After Williams made these statements, Jarod, Linett's son, walked toward her and Williams, and Williams invited Jarod on a hunting trip. After Jarod expressed interest, Williams turned to Linett and said, "See how easy that would be." Linett felt like she was "dying" because she believed that Williams was threatening her children too.

Subsequently, at some point in 2005, after Linett had filed a temporary restraining order in order to get records needed as executor of the estate, Linett met with Williams at a restaurant at Williams's request. Williams told her that he had been sent there by Dennis to act as a mediator and try to settle the lawsuit for $10 million. After Linett declined the offer, Williams told her that she was being offered a lot of money to walk away with her and her children's lives. Linett said that she asked her investigator, Young, to come with her to the restaurant because she did not feel safe. Finally, Linett testified that in January 2009, shortly after a scheduled mediation in the underlying lawsuit had failed, she received a call from her son Jarod informing her that Williams had come to their house, drunk, with a gun, looking for her.

On cross-examination, Linett agreed that Dennis never caused her any physical harm and that she never informed law enforcement authorities of any threats. She also agreed that, after the shooting incident, she and her family visited Dennis's home for a holiday celebration explaining that it was the first Christmas after her husband's death and that she didn't want to spoil her children's Christmas traditions. Although she further agreed that she had allowed her sons to go hunting with Dennis around this time, she remembered the hunting trip as occurring shortly after Thanksgiving in early December prior to the shooting incident. She stated that Dennis had not been to her house in four to five years and that in the beginning of 2004, she made repeated trips to Augusta Pines to review records. At some point, Dennis began telling her that he was going to kick her out of Augusta Pines and that he planned to call the police. Linett also agreed that in 2008, after a shareholders meeting that she attended at Augusta Pines, Dennis again demanded that she leave Augusta Pines immediately after the conclusion of the meeting or he threatened that he would call the police.

Dennis testified that, after his father's death in November 2003, Linett and her family attended a Christmas Eve dinner at his house. He also testified that he took Jarod, Rushton, and some other family members hunting, although he claimed that the hunting trip took place after the Christmas holidays instead of in early December as Linett had remembered. Dennis denied the incident involving the shooting, but stated that in January or

February 2004, he showed Linett how to use a gun, at her request.

Dennis further testified that, after his father's death, Linett spent every day at the Augusta Pines office. Dennis gave Linett office space and employees to retrieve requested records.

Seven months after his father's death, after Linett and her accountant had reviewed three years of records, Dennis believed that Linett's continued records requests had become too onerous. Dennis also had a problem with Linett during the summer of 2004 when he discovered that Linett had removed original records from the Augusta Pines office. When Dennis confronted Linett, Linett became more disruptive around the office. In June 2004, Dennis instructed his employees not to provide Linett any additional records without his permission. Shortly after, in September 2004, Linett filed the underlying lawsuit.

Dennis said that, several weeks after Linett filed suit, Linett appeared at a golf tournament at Augusta Pines with her two daughters. Dennis told Linett that she was no longer welcome at Augusta Pines and that she would have to leave or he would call the police. Linett continued to go to Augusta Pines, and Dennis recalled at least three other occasions through 2006 where he had told Linett to leave or he would call the police. On one occasion, Linett threatened Dennis that she would "be getting rid of [him]."

Dennis then referred to an incident in April 2007 when police were actually called to remove Linett from Augusta Pines. Dennis also recalled an incident in 2008 when, after a shareholders meeting, Linett became angry and threatened to get Dennis "no matter what." Dennis testified that he considered this a threat because he determined Linett's demeanor was "changing" and she was "going over the edge."

Dennis also denied ever asking Williams to act on his behalf and claimed that the only conversation he ever had with Williams regarding the underlying lawsuit was when he told Williams that Linett had sued him. Dennis admitted that, on January 14, 2009, the date on which Williams allegedly went to Linett's house with a gun, he had played golf with Williams and also had multiple phone conversations with Williams that evening. On cross-examination, Dennis agreed that he was close friends with Williams.

Elvia Dubon, Linett's housekeeper, testified that she witnessed Dennis shooting a gun at Linett's home and later found cans with holes in the yard. Bill Young, Linett's private investigator, testified that he had witnessed the meeting between Linett and Williams at the restaurant and that Linett appeared to have been threatened by the way she was acting, although he agreed he did not personally hear or observe Williams threaten her. Jarod, Linett's son, testified that on January 14, 2009, Williams came to their home looking for Linett, and Williams was armed and intoxicated. Williams testified and denied that he had been authorized by Dennis to meet with Linett.

Following this hearing, the trial court entered a 14–page protective order, in which the trial court made numerous findings of fact and conclusions of law. The trial court found that between November 2003 and January 2004, Dennis had gone to Linett's home and threatened her with a gun and that in January 2004 Dennis told Linett he did not know what would happen to her if she got in his way. The trial court further found that the shooting incident involving Dennis was substantiated by the housekeeper's testimony.

In regard to Williams, the trial court found that "it was more likely than not"

that Williams was acting on the instructions of Dennis in contacting and threatening Linett and her family on several occasions since 2004. For example, the trial court found that in 2004, Williams went to Linett's house on behalf of Dennis, offered her $4 million, told her to keep her mouth shut or she could disappear, and also threatened to take Linett's son hunting and have an "accident." The trial court further found that in 2005, Williams met with Linett at a restaurant, represented he was there on behalf of Dennis, and offered to settle the lawsuit. Additionally the trial court found that on January 14, 2009, Dennis and Williams exchanged multiple phone calls, and later that evening, Williams went to Linett's house with a gun looking for her and that, on January 15, 2009, Dennis made payments to Williams that provided "some evidence of a quid pro quo."

The trial court also found that Dennis's and Williams's credibility had been diminished by their own testimony. The trial court found Dennis's testimony that Williams was a better friend of Linett's than of Dennis's had diminished Dennis's credibility especially since there was "clear evidence that Dennis Wilkerson sees Mr. Williams at least weekly and Linett Wilkerson did not see him between 2005 and 2009." The trial court also noted that Dennis agreed that he had never instructed Williams to refrain from contacting Linett after learning of Williams's visits. The trial court further noted that Dennis's demeanor in the courtroom showed that Dennis considered the encounters between Williams and Linett as "no big deal." In regard to Williams, the trial court determined that his credibility was diminished by his testimony that he did not know that Linett was attempting to serve him with process.

The trial court recognized that Linett's application for a protective order could have "some component of strategy" to assassinate Dennis's character and stated that it "did not take that concern lightly." The court found, however, that "the potential for imminent and escalating family violence and threats will continue to exist between the parties as both lawsuits proceed." The court concluded that there was evidence that Dennis "committed, and caused others to commit family violence and threats on his behalf" and that Dennis was "likely to commit such family violence in the future." In regard to the relationship between Dennis and Williams, the trial court stated,

The court is aware of contentions by [Dennis's] counsel that [Williams] is not a family or household member. However, this Court finds as a matter of law that [Dennis] should not be permitted to avoid being subject to a protective order by causing another person to commit family violence or make threats on his behalf. This would seem to be counter to the public policy behind the Family Code protective order scheme.

Thus, the trial court ordered that Dennis be prohibited from committing family violence or from having any person, including Williams, commit family violence on his behalf, from communicating with Linett or her children, and from going to or near Linett or her children. The trial court subsequently conducted another hearing at which it received evidence on Linett's attorney's fees, and it entered a supplemental order awarding Linett additional expenses and attorney's fees.

### Standard of Review

■■■ A legal sufficiency challenge to a family violence protective order, like any other legal sufficiency challenge, may be sustained only when "(1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules

of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact." *Clements v. Haskovec*, 251 S.W.3d 79, 84 (Tex.App.-Corpus Christi 2008, no pet.). In reviewing the legal sufficiency of the evidence, a court must consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). If the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id.* However, a reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within the zone of reasonable disagreement. *Id.* Moreover, the trier-of-fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Vongontard v. Tippit*, 137 S.W.3d 109, 112 (Tex.App.-Houston [1st Dist.] 2004, no pet.). We will not substitute our judgment for that of the trial court merely because we might reach a different conclusion. *Id.*

### Applicability of a Family Violence Protective Order

█ In his first issue, Dennis asserts that this case is not an "appropriate case" for the issuance of a family violence protective order. In a portion of his brief entitled "preface," Dennis asserts that "Title 4 of the Family Code was enacted to provide a prompt and efficient way to obtain a court order ... without having to institute divorce proceedings," "the relationship between Linett and Dennis stretches the statutory definition of family to its outer limits," "family violence cases almost always involve members of the same household," "Linett and Dennis have never shared a household," and Linett's application "is based on her attenuated relationship to Dennis as his father's third wife."

"With regard to family violence under Section 71.004(1) ..., an adult member of the family or household may file an application for a protective order to protect the applicant or any other member of the applicant's family or household." Tex. Fam. Code Ann. § 82.002 (Vernon 2008). "'Family' includes individuals related by consanguinity or affinity, as determined under Sections 573.022 and 573.024, Government Code." *Id.* § 71.003. "Two individuals are related to each other by consanguinity if: (1) one is a descendant of the other; or (2) they share a common ancestor." Tex. Gov't Code Ann. § 573.022(a) (Vernon 2008). "Two individuals are related to each other by affinity if: ... (2) the spouse of one of the individuals is related by consanguinity to the other individual." *Id.* § 573.024. "The ending of a marriage by divorce or the death of a spouse ends relationships by affinity created by that marriage unless a child of that marriage is living, in which case the marriage is considered to continue as long as a child of that marriage lives." *Id.*

Under the plain terms of the Family Code, Linett and Dennis are related by affinity and Dennis and Linett's four children, all of whom are also Dennis's half-brother and half-sisters, are related by consanguinity. Dennis does not cite any authority allowing this Court to judicially narrow the types of relationships to which a family violence protective order may apply. Accordingly, we hold that Linett was entitled to seek a family violence protective order for both herself and her four children.

We overrule Dennis's first issue, to the extent that he challenges the "appropriateness" of the family violence protective or-

der based upon his relationship with Linett and his four half-brothers and half-sisters.

### Sufficiency of the Evidence

■ In his third and fourth issues, Dennis asserts that there is legally insufficient evidence to support the trial court's findings that family violence occurred in the past and is likely to occur in the future.

A trial court shall render a family violence protective order "if the court finds that family violence has occurred and is likely to occur in the future." TEX. FAM. CODE ANN. § 81.001 (Vernon 2008); *see also id.* § 85.001(b). The Texas Family Code defines "family violence" as follows:

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a *threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault,* or sexual assault;
> . . .

*Id.* § 71.004(1)(emphasis added). In the present case, our focus is on evidence regarding threats made by Dennis or anyone acting on his behalf that placed Linnet and her children "in fear of imminent physical harm, bodily injury, assault" and the likelihood that such threats, if made, would reoccur in the future. *See id.*

Linett testified that, in late 2003, shortly after Jim's death, Dennis had become furious during a meeting at her house when Linett informed him that she intended to audit the family businesses. Dennis had Linett follow him outside, where he pulled out a gun and shot a number of cans. Dennis then told Linett, "I never miss," and Linett felt threatened that Dennis

could cause bodily harm to her and her children. Linett also stated that she felt Dennis was going to kill her during this encounter. According to Linett, Dennis then showed Linett that his glove compartment in his truck was full of ammunition in order to illustrate to her that he always had ammunition. Linett's testimony provides some evidence that Dennis threatened to shoot her if she continued her attempts to get involved in the family businesses. Moreover, Dubon, testified that she saw Linett and Dennis by the gazebo, Dennis went toward the refrigerator, Dennis fired a small gun, and there were four gun shots. Dubon saw Linett inside the home crying and she discovered four cans in the yard with holes in them. She recalled that later the children picked up shells from the gunshots and put them in a jar in the kitchen. Dubon's testimony supported Linett's version of events and contradicted Dennis's version of events.

We recognize that Dennis testified that he never threatened Linett with a gun, and Dennis hotly contested at the hearing what had actually occurred. Dennis also hotly contests this evidence on appeal. As Linett emphasizes, however, the trial court could have believed Linett rather than Dennis, in part based upon Dubon's testimony and in part based upon possible inconsistencies between Dennis's deposition testimony and his trial testimony regarding the shooting incident.[2] In sum, we conclude that the trial court, as the trier of fact, was entitled to believe Linett's testimony and find that Dennis threatened to shoot her with a gun if she pursued involvement in the family businesses.

---

**2.** For example, during his deposition, Dennis denied a shooting incident altogether and stated that Linett had "fabricated" the story. Only at trial did Dennis offer the alternative explanation that at one point he fired a pistol in Linett's yard. The trial court could have questioned why Dennis did not offer this testimony at his deposition.

Linett also testified that during 2004, while she was working at Augusta Pines, Dennis told her that he was the one in charge, she should not get in his way, and if she did, something would happen to her. Linett further testified that Dennis had threatened her over nine times with bodily injury while she was at Augusta Pines. Dennis argues that Linett's testimony shows only some "non-violent" and verbal statements to encourage Linett to leave. Dennis also emphasizes the inferences that could be drawn from contrary evidence showing that Linett never called the police and that she continued to come to Augusta Pines even after these alleged threats. We agree that the trier of fact could have considered this evidence in determining whether Dennis's threats reasonably placed Linnet in fear of imminent physical harm. However, the court could have additionally taken into consideration Linett's explanation that she did not notify law enforcement because she did not want to expose her children to negative knowledge about their half-brother, that her position as executor required her to go to Augusta Pines and that she felt less threatened when in the presence of other Augusta Pines employees.

We also agree that some of Linett's testimony regarding alleged threats by Dennis to exclude her from the office, standing alone, might be fairly considered as "non-violent" statements. As mentioned above, however, according to Linett, nine of these threats involved "bodily injury." [3] The trial court could have determined that this testimony, which referenced a specific number of threats of "bodily injury," was sufficiently specific to support a family violence finding. Finally, we note that the trial court could have considered the alleged threats at Augusta Pines in context and determined, based upon the evidence of Dennis's threats with a gun in 2003, that these additional threats reasonably placed Linett in fear of imminent physical harm, bodily injury, and assault. *See Ulmer v. Ulmer,* 130 S.W.3d 294, 300 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (reviewing sufficiency of evidence to support family violence protective order and noting that specific threats should be analyzed by considering record in its entirety). Accordingly, we conclude that the trial court could have found that Dennis continued to threaten Linett with bodily injury while Linett was at Augusta Pines and that these threats reasonably placed Linett in fear of imminent physical harm, bodily injury, or assault.[4]

3. We note that Linett's testimony regarding these nine alleged threats at Augusta Pines is *not qualified by a date range and is not tied* specifically to Linett's other testimony. Thus, the trial court could have determined that this testimony provided some additional evidence that Linett was threatened with bodily injury at Augusta Pines during other times than those specifically referenced by Linett in her trial testimony.

4. In support of his argument that Linett's testimony presents nothing more than proof of non-violent and verbal statements that do not support the family violence findings, Dennis primarily relies upon two unreported cases: *Gonzalez v. Rangel,* No. 13–05–641–CV, 2006 WL 2371464 (Tex.App.-Corpus

Christi Aug. 17, 2006, no pet.) and *Thompson v. Thompson-O'Rear,* No. 06–03–00129–CV, 2004 WL 1243080 (Tex.App.-Texarkana June 8, 2004, no pet.). In *Gonzalez,* the court determined that evidence that the appellant had threatened to ruin her ex-boyfriend's career, that she had told him that she had shot her ex-husband, that she had made phone calls to her ex-boyfriend, and that she had told her ex-boyfriend that he would die if he did not come home from Iraq was insufficient to support a finding of family violence. *Gonzalez,* 2006 WL 2371464, at *3. The court noted that without any evidence that the boyfriend was placed in any fear by the statement regarding the ex-husband and without any evidence as to the context of the statement concerning Iraq, the evidence did support a

Regarding the evidence of the specific threats made from 2005 to 2009 by Williams, allegedly on behalf of Dennis, the trial court made extensive findings. First, the trial court found that Dennis's and Williams's credibility had been diminished by providing testimony that was inconsistent and contrary to "clear evidence." Second, the trial court found that "it was more likely than not" that Williams was acting on Dennis's behalf "in contacting and threatening [Linett] and her family on several occasions since 2004." The trial court based these findings upon Williams's, Dennis's, and Linett's testimony, which we detail below.

At trial, Linett testified that Williams came to her house two times in 2004. On the second visit, Linett testified that he threatened her life and the lives of her children and he made an offer of $4 million to keep her "mouth shut" and never return to Augusta Pines. She further testified that Williams told her during this visit that "Dennis sent him over." Dennis did not object to this testimony. After telling her that he was there on behalf of Dennis, Williams told Linett that "anything" could happen to her and that she could disappear and no one would know. Williams also suggested that her children could be involved in a hunting accident. Williams agreed that he went to Linett's house after learning from Dennis that Linett had filed the underlying lawsuit. Williams claimed that he encouraged Linett not to proceed with the lawsuit, and he denied threaten-

ing Linett or her children. He also denied meeting with Linett on behalf of Dennis.

Linett further testified that, in 2005, shortly after having been granted a TRO to secure records necessary to fulfill her duties as executor of Jim's estate, Williams asked for another meeting. At this meeting, Williams again told her that he was meeting with her on behalf of Dennis in the capacity as a mediator. This time, Dennis objected to Linett's testimony regarding Williams's representation that he was appearing on behalf of Dennis. Linett stated that at this meeting Williams offered $10 million to settle the lawsuit, and Williams indicated the lives of Linett and her children were at stake. Linett also explained that she had arranged for her private investigator to be present in the restaurant during this meeting because she felt that her safety was going to be "jeopardized" by Williams. The investigator testified and corroborated Linett's testimony that she asked him to accompany her to this meeting because of safety concerns. Williams agreed that the meeting took place, but he described the meeting as cordial and denied threatening Linett. He further explained that he was meeting to help Linett and to fulfill a promise he had made to Jim to provide guidance to Linett on business matters.

Finally, Linett testified that, on January 14, 2009, she received a call from her son Jarod telling her that Williams had come to the house late in the evening intoxicat-

---

finding of family violence. *Id.* The court also concluded that the bare, non-detailed testimony about the existence of phone calls did not support the finding of family violence. *Id.* In *Thompson*, the court determined that an ex-husband's verbal confrontations with his ex-wife and her new spouse and his e-mails to the children's schools criticizing his ex-wife, among other things, did not support the protective order. 2004 WL 1243080, at *3–4. The trial court also noted that the ex-wife

testified that her ex-husband had never threatened her with physical harm. *Id.* at *3. Here, Linett provided testimony that Dennis had threatened her life, and the lives of her children, with a gun, and Dennis had discharged the gun in Linett's presence to show her that he did not "miss." Dennis subsequently threatened Linett's life again by telling her she could disappear. The instant case is factually distinguishable from *Gonzalez* and *Thompson*.

ed, with a gun, looking for her. Jarod testified that Williams arrived, uninvited, after 10:00 at night. He said that Williams drove very slowly up the driveway, stopped, and "started revving up his engine in a . . . threatening manner." Prior to Williams's entrance, Jarod hurried to his brother Rushton's room with a shotgun and told him "if anything happens, I want you to use it." Jarod recounted that, upon entering, Williams asked if his mother was at home and continuously patted the gun in his pants. Jarod tried "not to do anything that would make him want to use [the gun]" and tried to act as a "barrier" so that Williams couldn't go any further into the house. Williams eventually left. Jarod testified that he felt threatened and he felt that his mother, his brother and his younger sisters were being threatened. Rushton, Jarod's brother, testified that on the night in question, he was sleeping and Jarod rushed into his room and told him to get the shotgun ready. Rushton also testified that Jarod told him that Williams had his hand on his gun while in the house.

Williams agreed that he went to Linett's house around 11:00 at night after he "heard at the [Augusta Pines] office that they were going to mediation." Williams claimed that his intention was to tell Linett that she could "make a deal." Williams admitted that he went to Linett's house after having "some beers on the golf course" while playing with Dennis that day and then having a couple of glasses of wine at a restaurant near Linett's house. Williams also admitted to speaking on the phone two times with Dennis from the restaurant before going to Linett's house uninvited, although Williams stated that he was setting up another golf game with Dennis and not discussing Linett or the lawsuit.

Making all inferences in favor of the trial court's finding, as we must, we conclude that there is legally sufficient evidence to support the trial court's finding that Williams met with and threatened Linett and her family on behalf of Dennis. As noted above, Linett testified Williams told her during their meetings in 2004 and 2005 that he was meeting with Linett on behalf of Dennis. Even if a portion of Linett's testimony regarding the 2005 meeting should have been excluded on hearsay grounds,[5] Dennis did not object to Linett's testimony regarding the 2004 meeting. Moreover, Williams himself testified that he went to Linett's house in January 2009 after hearing about the mediation at the Augusta Pines office, playing golf with Dennis that day, and speaking with Dennis on the phone two times. The trial court was presented with sufficient evidence to conclude that beginning in 2004 through 2009 Williams continued to communicate with Linett regarding the lawsuit on behalf of and with the knowledge of Dennis.[6]

In sum, we hold, based upon the evidence of the continually escalating threats made by Dennis and the threats made by Williams on Dennis's behalf, involving the threat of the use of deadly force against Linett and her children if Linett continued

---

**5.** We separately discuss Dennis's evidentiary complaints below.

**6.** The trial court could have determined that Williams did not have any legitimate personal interest in the lawsuit and could have disbelieved Williams's testimony as to his reasons for staying involved in the dispute. Additionally, the trial court cited in its order evidence of payments made by one of Dennis's companies to Williams's company within days of Williams going to Linett's house, with a gun, and the trial court further found conflicts in Dennis's and Williams's testimony as to why this payment was made. The trial court also commented on Dennis's demeanor in the courtroom.

to pursue involvement in the family businesses and the underlying lawsuit, culminating in Williams's late night visit in which Jarod felt frightened enough to load the shotgun to protect his siblings, that there is legally sufficient evidence to support the trial court's finding that family violence occurred in the past. We similarly hold, based upon the history of the threats made by Dennis and by Williams on Dennis's behalf, spanning from 2003 to 2009, that there is legally sufficient evidence to support the trial court's finding that family violence is likely to occur in the future as the underlying lawsuit proceeds. *See Clements,* 251 S.W.3d at 87 (holding that evidence of a pattern of family violence in past can support a finding that family violence will likely occur again in the future).[7] We specifically note that the evidence of family violence in this case was tied directly to the fact that Linett is pursuing the underlying lawsuit against Dennis, that each threatening incident occurred following a critical juncture in the proceeding, and that the family violence protective order was entered in April 2009, following the conclusion of an unsuccessful mediation and the anticipation of setting a trial date. Hence, we find very persuasive the finding by the trial court that the potential for imminent and escalating family violence will continue to exist as the lawsuit proceeds.

We overrule Dennis's third and fourth issues.

### Evidentiary Complaints

In his second issue, Dennis asserts that a family violence protective order cannot "survive appellate scrutiny when it is based on argument, innuendo and inadmissible evidence." Dennis specifically contends that the trial court erred in admitting certain evidence and that the cumulative effect of the trial court's evidentiary errors renders the evidence insufficient.

First, Dennis complains that the trial court erred in admitting a portion of Linett's testimony on the ground of hearsay. However, as explained above, Dennis failed to object on at least one occasion to Linett's testimony that Williams was meeting with Linett on behalf of Dennis. We also note that Linett argues that her testimony regarding Williams's representations that he was meeting with her on behalf of Dennis was admissible because Williams was a named party to Linett's suit seeking a protective order and Williams was Dennis's agent and co-conspirator. *See* Tex.R. Evid. 801(e)(2)(D) (providing that "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is admission by party-opponent and is not hearsay); Tex.R. Evid. 801(e)(2)(E) (providing that "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is an admission by party-opponent and is not hearsay).[8] However, we need not directly address the admissibility of the challenged portion of Linett's testimony regarding Williams's representations during their 2005 meeting because we conclude that Linett's testimony, to which Dennis did not object, together with the circumstantial evidence cited by the trial court in its family violence protective or-

---

7. Within his issues, Dennis argues that "considering the absence of credible evidence to support a finding of family violence," the family violence protective order unfairly stigmatizes him. Having held that there is sufficient evidence supporting the trial court's findings of family violence, we necessarily reject Dennis's argument regarding stigma.

8. Dennis does not address these arguments in his reply brief.

der, was sufficient for the trial court to conclude that Williams was meeting with Linett on behalf of Dennis.

■ Second, Dennis complains that the trial court erred in admitting evidence related to his 30–year–old misdemeanor convictions arising from conduct committed when he was 17 years old, with no evidence of intervening conduct. Dennis asserts that these convictions were inadmissible under Texas Rules of Evidence 404 and 609.

The trial court relied upon evidence of these misdemeanor convictions to make the following finding of fact and conclusion of law:

2. First, the Court finds that [Dennis] has exhibited a history of violent and threatening behavior. He is now a 48 year old man and a father. As a teenager in the late 1970's he was convicted of shooting an individual with a shotgun. Of note, the Court finds that the shooting occurred after other persons apparently shot and otherwise damaged his vehicle, and Dennis claims to have been acting in retaliation. [Dennis] was also convicted of falsely imprisoning a young woman as a teenager. [Dennis's] counsel argued strenuously that this evidence was irrelevant to the proceedings and also inadmissable under Texas Rule of Evidence 609. . . . This Court finds that the nature of the past crimes is relevant to the issues before this Court because they involve guns, as do the threats in this case, because they involve retaliation, as does this case, and because they involve violence towards women, as does this case. For the same reasons, the Court finds that the convictions are not

excluded by Texas Rule of Evidence 403, . . . .

In his reply brief, Dennis notes that during the hearing, the trial court stated that it considered the evidence related to Dennis's criminal history to be "very significant." Dennis then argues that because the trial court stated in paragraph 2 of the family violence protective order that it based its ultimate findings of family violence on the "foregoing," the admission of Dennis's prior criminal records was not only improper, but also harmful.

Assuming that the trial court erred in admitting evidence pertaining to Dennis's 1970's misdemeanor convictions because such evidence was irrelevant to the issue of family violence or because such evidence constituted inadmissible character evidence, *see* TEX.R. EVID. 404(b), we disagree with Dennis's contention that "critical fact" findings necessary to support the family violence protective order must be set aside and that, as a result, the evidence is legally insufficient. We recognize that the trial court stated in paragraph 2 that the evidence showed, among other things, a history of violent and threatening behavior. However, paragraph 2 was only one paragraph in a 14–page protective order that was extremely detailed. The overwhelming majority of the trial court's fact findings in its 23 paragraph order concerned the testimony regarding the specific threats made between the parties. Our review of the record also reveals that, although Linett and her counsel placed some emphasis on Dennis's criminal history and vigorously argued for its admission, the overwhelming majority of the witnesses and testimony concerned the alleged threats made by Dennis, Williams, and Linett from 2003 to 2009.[9] Accordingly,

9. We purposefully omitted from our prior analysis any evidence pertaining to Dennis's thirty-year old misdemeanor convictions. We

also note that, in the prayer of his brief, Dennis asks us only to reverse the family violence protective order and does not ask us

we cannot conclude that any of the complained-of evidentiary errors committed by the trial court probably caused the rendition of an improper judgment. *See* TEX. R.APP. P. 44.1.

We overrule Dennis's second issue.

## Attorney's Fees

In an issue presented in a supplemental brief, Dennis contends that "if the family violence protective order is reversed on appeal," the trial court's order awarding attorney's fees to Linett must also be reversed. Dennis does not present any other substantive challenge to the attorney's fees award. Having held that sufficient evidence support's the family violence protective order, we hold that the attorney's fees award should not be reversed.

We overrule Dennis's issue raised in his supplemental brief.

## Conclusion

We affirm the order of the trial court.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

In this case, the trial court expressly recognized that the application of appellee, Linett M. Wilkerson, for a family violence protective order [1] in her underlying lawsuit [2] against appellant, Dennis J. Wilkerson, for breach of contract, breach of fiduciary duty, and a valuation of their respective interests in certain business entities could have "some component of strategy" to "assassinate" Dennis's character. A family violence protective order should never be sought in such a manner to gain leverage in civil litigation, especially when there is no evidence to support the issuance of such an order.

There simply is no evidence in the record before us that Dennis, either acting alone or through his friend, Robert Lee "Buddy" Williams, did anything to reasonably place Linett or her children in fear of *imminent* physical harm, bodily injury, or assault. Significantly, from 2003 to 2009, Linett made no attempt whatsoever to contact law enforcement authorities for emergency assistance against either Dennis or Williams. [3] At most, to the extent that the actions of Dennis and Williams may be interpreted as threats, they concerned threats of future harm, not "present" and "immediate" harm.

Accordingly, I would hold that the evidence is legally insufficient to support the trial court's issuance of a family protective order against Dennis and the trial court erred in entering the order and awarding Linett $98,560 in attorney's fees and $14,030 in costs to obtain the order. The majority errs in holding to the contrary, and I respectfully dissent.

## *Imminent* Danger

In his third and fourth issues, Dennis argues that the evidence is legally insufficient to support the trial court's issuance of a family violence protective order be-

---

to modify the protective order by deleting paragraph 2 referencing Dennis's prior convictions.

1. *See* TEX. FAM.CODE ANN. § 82.002 (Vernon Supp. 2008).

2. The underlying lawsuit is styled *Wilkerson v. Wilkerson*, No. 2004–50710, pending in the 151st District Court of Harris County, Texas.

3. Linett also sought a protective order against Williams, but she never served Williams in the proceeding. As is discussed in the trial court's order and in the majority opinion, Williams appeared to testify at the hearing on the application at Dennis's request.

cause there is no evidence that he engaged in conduct that *"reasonably* caused Linett to fear *imminent* physical harm or bodily injury."

A legal sufficiency challenge to a family violence protective order, like any other legal sufficiency challenge, may be sustained only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Clements v. Haskovec,* 251 S.W.3d 79, 84 (Tex.App.-Corpus Christi 2008, no pet.). In reviewing the legal sufficiency of the evidence, a court must consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). "[L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. If the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id.* at 822. Moreover, "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). However, a reviewing court cannot substitute its judgment for that of the trier of fact, so long as the evidence falls within the zone of reasonable disagreement. *Id.* Moreover, the fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Vongontard v. Tippit,*

137 S.W.3d 109, 113 (Tex.App.-Houston [1st Dist.] 2004, no pet.). We will not substitute our judgment for that of the fact finder merely because we might reach a different conclusion. *Id.*

A trial court must issue a family violence protective order if it "finds that family violence has occurred and is likely to occur in the future." Tex. Fam.Code Ann. § 81.001 (Vernon 2002); *see also id.* § 85.001(b) (Vernon 2002). The Texas Family Code defines "family violence" as

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that *reasonably* places the member in fear of *imminent* physical harm, bodily injury, assault, or sexual assault, . . .

*Id.* § 71.004(1) (Vernon 2008) (emphasis added). Thus, our focus should be on evidence of any threats made by Dennis or anyone acting on his behalf that "reasonably" placed Linnet and her children "in fear of imminent physical harm, bodily injury, [or] assault" and the likelihood that such threats, if made, would reoccur in the future. *Id.* §§ 71.004(1), 81.001.

The Texas Court of Criminal Appeals and this Court have construed the term "imminent" to refer to "a present threat, not a future threat of bodily injury or death." *Robertson v. State,* 175 S.W.3d 359, 362 (Tex.App.-Houston [1st Dist.] 2004, pet. ref'd) (citing *Devine v. State,* 786 S.W.2d 268, 270 (Tex.Crim.App.1989)). "Imminent" means "near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous." *Devine,* 786 S.W.2d at 270 (quoting Black's Law Dictionary 676 (rev. 5th ed. 1979)). In other words, "imminent" means

"ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Id.* at 270. It refers to a present, not a future, threat of harm. *Anguish v. State*, 991 S.W.2d 883, 886 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd). The threat must be of present injury, rather than of some future consequence. *Brown v. State*, 960 S.W.2d 265, 269 n. 1 (Tex.App.-Corpus Christi 1997, no pet.). Thus, the pertinent question is whether Linett was reasonably placed in fear of "imminent" physical harm, bodily injury, or assault at the time any threat was made.

Here, there is nothing in the record to show that Linett or her children were ever threatened by Dennis or Williams with *imminent* physical harm, bodily injury, or assault from 2003 to February 2009, when she first applied for a family protective order in the underlying litigation without ever having contacted law enforcement officials for emergency assistance.

First, in regard to the 2003 incident in which Dennis, according to Linett, expressed his anger about her intention to learn about the family businesses and then shot some beer cans from her gazebo and told her "I never miss" and "I always have plenty of ammunition," Linett did explain that she felt threatened and believed that Dennis was capable of causing bodily injury to her and her children. However, there is no evidence that Dennis pointed his firearm at Linett or said anything to imply that she or her children were in imminent danger. Even excluding Dennis's testimony that he merely showed Linett how to use a gun, any "feeling" that Linett had that Dennis was "going to kill" her during this encounter was not reasonable considering the facts that she apparently followed Dennis out to the gazebo and then to his car and did not call for emergency assistance at the time or any-time thereafter. Rather, Linett waited over five years after this alleged incident to file her application in the underlying litigation for a protective order seeking relief based, in large part, upon this 2003 incident. In fact, on cross-examination, Linett admitted that after this 2003 incident she and her family visited Dennis's house for a holiday celebration, and, as discussed in more depth below, Linett spent significant amounts of time working at Augusta Pines on a daily basis near and around Dennis. The trial court, acting as the fact finder, was not free to ignore Linett's own testimony about how she behaved during and after the incident. *See City of Keller*, 168 S.W.3d at 827.

Second, Linett did testify that, in 2004, Dennis, after she had actually begun working at Augusta Pines, told Linett that she was not to "get in his way," to ask first if she needed anything, and, if she got in his way, "something would happen to her." She also testified, without providing any time references or any details, that Dennis had "threatened" her "over nine times." However, nothing in her testimony established that anything said to her by Dennis while she was working at Augusta Pines demonstrated that Dennis reasonably placed her in fear of imminent physical harm. In fact, disregarding Dennis's testimony that Linett had become disruptive at Augusta Pines, Linett's own testimony establishes that she continued to return to Augusta Pines for accounting information and later for shareholder meetings, she never contacted law enforcement authorities for emergency assistance, and, in fact, Dennis told her that he would call for emergency assistance if she did not leave the premises. Again, the trial court, acting as the fact finder, was not free to ignore Linett's own testimony about what occurred at Augusta Pines. *See id.*

Finally, in regard to Williams, Linett did testify that Williams did come to her house and told her that "anything" could happen to her and "[w]e can take your children hunting and there can be an accident." Linett also testified that she felt unsafe meeting with Williams by herself at a restaurant so she had a private investigator accompany her and watch from a distance. Linett further testified that she subsequently received a telephone call from her son, who told her that Williams, who had a gun and was intoxicated, had come to their house looking for her. Her son also testified that, while Williams was at Linett's home, he "felt threatened."

However, Linett's son also testified that Williams made no verbal threat against him or Linett during this visit, he was not afraid of Williams and did not believe that Williams intended to hurt him during this visit, and he did not believe that Williams intended to hurt his mother that evening. He explained that Williams had greeted him "really warmly" and, when Williams patted his gun "really gently," he did not think Williams would pull it out. Also, Linett's own investigator testified that, although, during the meeting at the restaurant, Linett appeared to feel threatened, he did not see Williams take any overt action that threatened Linett at that time with imminent harm.

When viewed in the light most favorable to the trial court's findings, none of the actions of Williams could have reasonably placed Linett or her children in fear of imminent harm. Any perceived threats concerned future, not imminent physical harm. Moreover, the trial court, acting as a fact finder, was not free to disregard the

testimony of Linett's own son that he was not afraid of Williams and did not believe that Williams would hurt him. *See id.* Nor was it free to disregard the testimony of Linett's own investigator that he did not see Williams make any overt threats during the meeting at the restaurant between Williams and Linett. *See id.*

In sum, there is no evidence that Dennis, either acting alone or through Williams, did anything to reasonably place Linett or her children in fear of *imminent* physical harm, bodily injury, or assault. At most, to the extent that the actions of Dennis and Williams may be interpreted as threats, they concerned threats of future harm, not "present" and "immediate" harm. In fact, from 2003 to 2009, Linett did not contact law enforcement authorities for emergency assistance against either Dennis or Williams, a critical fact that the trial court was not free to disregard. *See id.* Accordingly, I would hold that the evidence is legally insufficient to support the trial court's issuance of a family protective order against Dennis and the trial court erred in entering the order. I would sustain Dennis's third and fourth issues.

### Attorney's Fees

In an issue presented in a supplemental brief,[4] Dennis argues that "if the family violence protective order is reversed on appeal," the trial court's order awarding attorney's fees to Linett must also be reversed.[5] Linett asserts that the trial court's award of fees, expenses, and costs "was not contingent on success on appeal" and "there is no provision for the appeal of

---

4. We permitted the filing of supplemental briefing on this issue because the trial court modified its protective order after Dennis filed his first notice of appeal.

5. Dennis does not challenge the reasonableness of the fees and costs awarded, the statutory basis for the fees and costs, or the trial court's reopening of evidence on the issue of attorney's fees after entering the protective order.

the court's mandatory award of attorney's fees."

After entering the protective order, the trial court issued an order modifying the protective order and requiring Dennis to pay Linett $98,560 in attorney's fees and $14,030 in costs. The trial court cited, as the basis for its award of fees and costs, sections 81.003 and 81.005(a) of the Texas Family Code. Section 81.003, entitled "Fees and Costs Paid by Party Found to Have Committed Family Violence," provides

> (a) Except on a showing of good cause or of the indigence of a party found to have committed family violence, the court shall require in a protective order that the party against whom the order is rendered pay the $16 protective order fee, the standard fees charged by the clerk of the court in a general civil proceeding for the cost of serving the order, the costs of court, and all other fees, charges, or expenses incurred in connection with the protective order.

TEX. FAM.CODE ANN. § 81.003 (Vernon 2008). Section 81.005, entitled "Attorney's Fees," provides, that a "court may assess reasonable attorney's fees against the party found to have committed family violence." *Id.* § 81.005(a) (Vernon 2008).

Sections 81.003 and 81.005 provided the trial court with the authority to award Linett her attorney's fees and costs based upon a finding of family violence. Because the evidence is legally insufficient to support the trial court's issuance of the family violence protective order against Dennis and the trial court erred in entering the order, I would further hold that the trial court had no authority to award Linett her attorney's fees and costs. Accordingly, I would reverse the trial court's award of fees and costs to Linett. *See Harrison v. Williams Dental Group, P.C.,* 140 S.W.3d 912, 918 (Tex.App.-Dallas 2004, no pet.) (holding that court of appeals could not affirm award of attorney's fees when it reversed judgment on breach of contract claim, which served as only basis for award of fees). I would sustain Dennis's issue raised in his supplemental brief.

### Conclusion

Because the evidence is legally insufficient to support the trial court's issuance of the family violence protective order against Dennis, I would vacate the trial court's family violence protective order and its order awarding Linett attorney's fees and costs.

