In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00568-CV**
_____

**CLOYCE DAVIS, Appellant**

**V.**

**RHONDA CEARLEY, Appellee**

**On Appeal from the 418th District Court**
**Montgomery County, Texas**
**Trial Cause No. 12-09-10222 CV**

**MEMORANDUM OPINION**

Appellant Cloyce Davis challenges the trial court's order granting the application for a family violence protective order filed by his former girlfriend, appellee Rhonda Cearley. We affirm the trial court's protective order.

BACKGROUND

Cearley filed an application for a protective order against Davis. Cearley alleged that Davis had committed family violence and would likely commit family violence in the future. The application was supported by Cearley's affidavit. The

trial court signed an *ex parte* temporary protective order and set a hearing on Cearley's application. Davis filed an application for a protective order against Cearley, which was supported by Davis's affidavit.

The trial court conducted a hearing on both applications on October 23, 2012. Cearley appeared *pro se*, and Davis was represented by counsel. Cearley testified that she and Davis had dated for about four years, had an intimate relationship, and had lived together. Cearley testified that in the past, Davis had hit her, pushed her, and cursed her. Cearley testified that Davis had slapped her six times during their four-year relationship and had struck her with a closed fist twice. According to Cearley, Davis "does methamphetamine" and then "wants to fight" with her.

Cearley testified that on August 15, 2012, she told Davis to move out of her home because he was not treating her properly, and she slapped Davis's face one time. Cearley testified that she threw Davis's clothes and belongings into the back of his truck because Davis refused to leave. The next day, Cearley returned home to find Davis in the house, and she testified that he immediately began cursing at her. Cearley testified as follows:

> [H]e told me that he would make sure that no one ever was with me again and that I was dead. And then that's when he . . . grabbed me by my throat and threw me against the cabinets. I busted the back of my

2

head against the tile floor, had to have two staples in the back of my head, and I broke my neck.

Cearley denied striking Davis that day. Cearley explained that she lost consciousness after Davis broke her neck, and when she regained consciousness, Davis looked at her with hatred, threw her onto the kitchen table, and broke her phone when she tried to call 911. Cearley testified that she fears Davis will come after her again because he has told other people that he will do so. Cearley explained that she no longer has any property that Davis believes he owns, so she does not know why Davis returned to her house on August 16th.

On cross-examination, Cearley testified that she has a thirteen-year-old daughter. Cearley explained that her parents own the house where she lived with Davis and her daughter, and her parents refused to evict Davis because they were unaware of what was happening. Cearley testified that she takes several medications because she is diabetic, has high blood pressure, and has slipped discs, a pinched nerve, and a broken neck. Cearley denied being a violent person, and she testified that she had never struck Davis until she slapped him the day before he broke her neck. She admitted that she has sometimes cursed at Davis. Cearley denied getting into physical confrontations with her parents or her daughter. Cearley testified that although Davis choked her, she did not have any marks around her neck.

3

Davis testified that he did not confront Cearley on August 15, but Cearley told him to get his clothes and shoved Davis and hit him. According to Davis, Cearley's parents had told him not to leave. Davis testified that Cearley was becoming violent, told him to leave, and began taking his belongings to the truck. Davis explained that Cearley hit him four or five times while he was attempting to retrieve his belongings from the bedroom. Davis testified that after he went outside to the porch, he was talking to Cearley's mother and daughter, and Cearley again began slapping, pushing, and hitting him while her mother and daughter were trying to hold her back. According to Davis, Cearley was mad and upset, and he testified that Cearley "got violent pretty regularly" after the first two years of their relationship. Davis denied hitting or abusing Cearley prior to the day the incident occurred. Davis testified that later that night, Cearley's boyfriend began threatening him over the telephone.

Davis testified that when he got to the house the next morning to get his clothes, he had decided to move out and wanted to pick up his clothes. Davis explained that he believed Cearley would be out with her boyfriend. Davis testified that when he realized Cearley was home, "[s]he hugged me and told me she loved me and told me there was nobody else and told me she wanted to be with me." Davis testified that Cearley then called her boyfriend and handed the phone to

4

Davis. According to Davis, Cearley's boyfriend threatened to kill Davis if Davis did not leave Cearley's house. Davis testified that Cearley then began to hit and push him. Davis explained that he shoved Cearley away, and Cearley struck her head on the bottom of the cabinet. Davis testified that Cearley appeared to be "high on pills." Davis testified that he apologized to Cearley, and Cearley told him to leave. Davis explained that he did not intend to hurt Cearley when he pushed her.

Davis testified that he believes Cearley has his lawn mower, refrigerator, tools, trailer, a bedroom suite, and a freezer, and he wants those items returned to him. Davis stated that he would not do anything violent to retrieve his items from Cearley. Davis testified that he is currently residing with his new girlfriend, but he fears that Cearley will come after him "[b]ecause she's very violent and hateful." Davis denied telling anyone that he intended to kill Cearley or that if he could not have Cearley, no one could. Davis also denied that he had ever taken methamphetamine. Davis testified that he believed Cearley would come after him again if the trial court did not grant him a protective order against her.

Cearley's mother Shirley testified that on August 15, she saw Davis trying to leave the home, but Cearley "wouldn't let him get his clothes and boots and she was slapping him and cursing him." Shirley testified that she and her husband told Davis he did not have to leave because they owned the home. Shirley denied

5

seeing Cearley strike Davis or Davis strike Cearley before that day. Shirley explained that she has no firsthand knowledge of what happened on the day Cearley's neck was broken. On cross-examination, Shirley testified that Cearley can be abusive "when she doesn't get her way[,]" and that Cearley has some violent characteristics. According to Shirley, Cearley bruises easily, so she would expect to see marks on Cearley's neck if someone had choked Cearley. Shirley testified that she did not see any bruises or red marks on Cearley's neck or face on August 16. Shirley opined that Cearley was not in danger of being harmed by Davis in the future, but that Cearley "might be" a danger to Davis.

Cearley's father Jack testified that Cearley had physically attacked him before. Jack testified that Cearley has violent tendencies and suffers from mental problems. Cearley's boyfriend, Billy Wagner, testified that on August 16, he was talking to Cearley on the telephone, and he heard Cearley asking Davis to leave, and he then heard things shuffling across the floor, Cearley screamed, and the phone went dead.

At the conclusion of the hearing, the trial judge asked Davis if he would voluntarily submit to a rapid urinalysis for methamphetamine and Davis agreed. The trial court indicated that the results were "certainly . . . questionable if not positive for methamphetamine . . . ." The trial court found that family violence has

occurred in the past and is likely to occur in the future, and granted Cearley a protective order against Davis. The trial court denied Davis's request for a protective order.

## DAVIS'S ISSUE

In his sole appellate issue, Davis challenges the factual sufficiency of the evidence supporting the trial court's decision to grant Cearley's application for a protective order. Davis argues that he did not intend to harm Cearley, and his "slight use of force" was in self-defense. As the trier of fact, the trial court is the sole judge of the weight and credibility of the evidence, and is entitled to resolve any conflicts in the evidence and to choose which testimony to believe. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Wilkerson v. Wilkerson*, 321 S.W.3d 110, 116 (Tex. App.—Houston [1st Dist.] 2010, pet. dism'd). The fact finder may choose to believe one witness over another, and we may not substitute our judgment for that of the fact finder. *Golden Eagle Archery*, 116 S.W.3d at 761; *Figueroa v. Davis*, 318 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

"When the trial court acts primarily as a factfinder, appellate courts normally review its determinations under the legal and factual sufficiency standards." *In re*

7

*M.G.M.*, 163 S.W.3d 191, 201 (Tex. App.—Beaumont 2005, no pet.) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000)). When a party attacks the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate on appeal that there is insufficient evidence to support the adverse finding. *Id*. In conducting this review, "we must examine the entire record and consider and weigh all the evidence, both in support of, and contrary to, the challenged finding." *Id*. (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). "We must uphold the finding unless the evidence that supports it is so weak as to be clearly wrong or manifestly unjust." *Id*.

An applicant is entitled to a protective order if the trial court finds that family violence has occurred and is likely to occur in the future. Tex. Fam. Code Ann. § 81.001 (West 2008). "Family violence" includes "dating violence[,]" which the Family Code defines as:

> an act, other than a defensive measure to protect oneself, by an actor that: (1) is committed against a victim: (A) with whom the actor has or has had a dating relationship . . .; and (2) is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the victim in fear of imminent physical harm, bodily injury, assault, or sexual assault.

*Id*. §§ 71.004(3) (West 2008), 71.0021(a) (West Supp. 2012). The Family Code defines "dating relationship" as "a relationship between individuals who have or

8

have had a continuing relationship of a romantic or intimate nature." *Id*. § 71.0021(b).

Reviewing all of the evidence, we conclude that Davis has not demonstrated that the evidence supporting the trial court's protective order was factually insufficient. *See In re M.G.M.*, 163 S.W.3d at 201. As trier of fact, the trial court was the sole judge of the credibility of the witnesses. *See Wilkerson*, 321 S.W.3d at 116. In its role as fact finder, the trial court could reasonably conclude that Cearley was testifying truthfully. Credibility of witnesses is within the sole province of the fact finder. *Walker & Assocs. Surveying, Inc. v. Austin*, 301 S.W.3d 909, 916 (Tex. App.—Texarkana 2009, no pet.). The evidence supporting the trial court's protective order is not so weak as to make the trial court's protective order clearly wrong or manifestly unjust. *See id*. at 916 n.4; *see also* Tex. Fam. Code Ann. §§ 71.004(3), 71.0021(a), 81.001. Accordingly, we overrule Davis's sole issue and affirm the trial court's protective order.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice


Submitted on June 24, 2013
Opinion Delivered July11, 2013
Before McKeithen, C.J., Gaultney and Horton, JJ.

9