# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00559-CV

---

**Deborah Ellen Smuts, Appellant**

**v.**

**Gaspar Caracheo, Appellee**

---

**FROM THE COUNTY COURT AT LAW OF BURNET COUNTY
NO. 51,332, THE HONORABLE LINDA M. BAYLESS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Deborah Ellen Smuts appeals a two-year protective order granted on the application of her ex-husband, Gaspar Caracheo. Smuts contends that the evidence was legally and factually insufficient to support the trial court's findings on family violence and further, that the trial court abused its discretion by granting Caracheo's motion to conduct an in-chambers interview with their minor child. We will affirm the trial court's protective order.

## BACKGROUND

Evidence in the record, including from the October 7, 2020 protective-order hearing, shows that Smuts and Caracheo have been divorced since 2007 and that they have joint managing conservatorship of their two children, seventeen-year-old J.C. (who has a child of his own) and fourteen-year-old M.C., who was interviewed by the court in this case. Smuts remarried about three years before the hearing. Caracheo remarried about seven months before

the hearing. M.C. lives with Caracheo, his second wife Lydia Miller Caracheo,[1] and two other children, who are unrelated to Smuts.[2]

Caracheo, Lydia, Lydia's acquaintance Jacob Franks, and M.C. testified at the protective-order hearing. Smuts did not testify or present any witnesses at the hearing. The witnesses each testified about the events that began August 13, 2020. M.C. was having lab work performed at a clinic that morning, and as Caracheo walked with her to the clinic, he saw that Smuts was already inside. Caracheo testified that Smuts was upset because he had planned to ask Lydia to take M.C. to the clinic instead of him, and he thought that Smuts perceived this as "taking over her motherhood role." Before he left the clinic, Caracheo told M.C. that Smuts could take her home and walked back to his vehicle. However, he changed his mind shortly afterward, and he asked Lydia to tell M.C. that they would pick up breakfast for her and then meet her in the parking lot to take her home with them. Lydia walked inside the clinic and did so. After picking up breakfast, they returned to the clinic, and M.C. got into the back of the vehicle where the other two children were seated. Lydia, who was in the driver's seat, saw her acquaintance Jacob Franks in the parking lot and waved to him.

Franks testified that he saw Lydia, his wife's former co-worker, and was about to walk with his young son to greet her. But Franks then saw another woman—later identified as Smuts—approaching Lydia's vehicle on foot quickly and appearing "fairly upset." She yelled, "F– you, Lydia, go to hell and wait until he takes your unborn baby." Franks did not understand what the woman meant by that, but given the "heated situation," he and his son returned to their

---

[1] We refer to Lydia by her first name for clarity because she and Caracheo share the same last name.

[2] Caracheo testified that he adopted one child and that the other is a biological child in his custody.

vehicle and sat inside as Franks watched to ensure that "nothing physical was going to happen." Eventually, he saw the woman leave the vehicle and Lydia drove away, so he began pulling out from his parking space. As he did, he nearly collided with a gray sedan as it "blew past [him] in the parking lot" at an unsafe rate of speed. He saw the sedan "rushing towards the light" at an intersection where Lydia's vehicle was sitting and then saw the sedan "stopp[ing] abruptly," almost hitting Lydia's vehicle. Franks continued watching the sedan as he drove in the same direction, noticing that it was following Lydia's vehicle "very closely and aggressively," and making "jerking motions." He thought that the sedan was driven in a "dangerous manner" and was concerned for Lydia and the occupants of her vehicle. He stated that he "would definitely be in fear of [] getting into an accident if somebody was doing that to my vehicle behind me."

Caracheo testified about what he saw from the passenger seat of the vehicle when Smuts approached. He stated that when Lydia greeted Franks in the parking lot, Smuts was walking past, and Lydia waved goodbye to her. Smuts then ran up to the vehicle, grabbed the window and held it down, reached inside the vehicle, and yelled "all sorts of profanities" including, "F– you, bitch," and "Just wait till he takes your unborn baby." Caracheo testified that Smuts did this "in front of everybody out in the parking lot, and this isn't the first time this has happened." From the back seat, M.C. was asking Smuts to stop and saying, "Mom, I can't believe you're doing this." Caracheo recalled that after they drove from the parking lot, he saw Smuts "tailgating" them, pulling up right behind them at a red light, and leaving only a foot or two between the vehicles. He was concerned about Smuts doing so because he knew that she "had six major accidents," most involving her "rear-ending" other people's vehicles.

M.C. testified that shortly before she was picked up from the clinic, Smuts made a "gun threat" with reference to Caracheo and Lydia saying, "I should put a bullet on them," or

3

"through them." Later, M.C. was present in the vehicle when Smuts "got upset," "pushed the window down," and "cussed at [Lydia]." M.C. also testified that in February, before Caracheo and Lydia's wedding, she had an argument with Smuts after M.C. told a relative that sometimes she liked her stepmom better than her mom. Smuts opened the door "really fast," like "she was mad," but M.C.'s stepfather "caught the door" before it touched M.C.

Lydia testified that even before the events in the clinic parking lot on August 13, communication with Smuts had become difficult. At some point, Lydia and Caracheo told Smuts that they did not want any further communication with her by text message or phone calls, and that they would only communicate with her through the court-mandated app called "Our Family Wizard." Lydia also testified about the parking-lot event, recalling that Smuts "came at [her]" and that Smuts grabbed the window to the vehicle and "shoved it back down" when Lydia tried to roll it up. Smuts was "very belligerent," and exhibited "erratic" behavior, "saying the F word, F you, he's going to take your unborn baby, just wait till he does this to you." Once Smuts backed away from the car, Lydia drove out of the parking lot, but Smuts proceeded to "tailgate [them] aggressively." While following them, Smuts called Caracheo multiple times and left a voicemail on Lydia's phone saying, "If you think you're her mother, think again, bitch."

Caracheo and Lydia decided to pursue a protective order when M.C. told them about Smuts's gun threat. Caracheo noted that Smuts's "husband owns several guns in her house." Caracheo also noted that "these altercations" with Smuts "have been steadily growing and they have been getting more aggressive." Although he had "been dealing with this for 13 years," he expressed greater concern for the safety and well-being of Lydia and the two children. Lydia also testified that she thought she and her family were in danger based on the gun threat and the way that Smuts had been driving, willing to risk an accident while children were in the

vehicle.  Additionally, Lydia worried about the two other children's safety and welfare while with their babysitter because Smuts's grandchild (J.C.'s child) also stayed with that babysitter sometimes, and Smuts could "show up" there and cause a confrontation.  Finally, Lydia stated that she feared being shot or attacked by Smuts because of how "she came at me in my car."

After considering the evidence, the trial court stated on the record that it would grant Caracheo's application.  The trial court signed a two-year protective order against Smuts finding "that family violence has occurred and that family violence is very likely to occur in the future," stating that the protective order was "for the safety and welfare and in the best interest of" Caracheo, Lydia, and the two children in their home,[3] and noting that such order was "necessary for the prevention of family violence."  This appeal followed.

## DISCUSSION

**Sufficiency of the Evidence**

In her first issue, Smuts contends that the evidence was legally and factually insufficient to support the trial court's findings that family violence occurred and that it was likely to occur in the future.

We determine whether the evidence is legally sufficient to support a trial court's finding by considering the evidence in the light most favorable to the trial court's finding if a reasonable factfinder could, and disregarding evidence to the contrary unless a reasonable factfinder could not.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *In re Frasure*, No. 05-13-01667-CV, 2015 Tex. App. LEXIS 1057, at *12 (Tex. App.—Dallas Feb. 4, 2015, no pet.) (mem. op.).  A legal sufficiency challenge to a family violence protective order

---

[3] The protective order does not apply to M.C.

5

may be sustained only if: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *In re Frasure*, 2015 Tex. App. LEXIS 1057, at *12; *see City of Keller*, 168 S.W.3d at 810. Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). If there is any evidence of probative force to support the finding, we will overrule the legal-sufficiency issue. *Boyd v. Palmore*, 425 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

We determine whether the evidence is factually sufficient to support the trial court's finding by considering and weighing all the evidence presented and setting aside the trial court's findings only if they are so contrary to the overwhelming weight of the evidence that they are clearly wrong and unjust. *City of Keller*, 168 S.W.3d at 826; *In re Frasure*, 2015 Tex. App. LEXIS 1057, at *12. Under both the legal- and factual-sufficiency standards, the fact finder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819 (addressing legal-sufficiency standard); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (addressing factual-sufficiency standard); *In re Frasure*, 2015 Tex. App. LEXIS 1057, at *13 (addressing both standards).

The Family Code states that a trial court "shall render a family violence protective order" if it "finds that family violence has occurred and is likely to occur in the future." Tex. Fam. Code §§ 81.001, 85.001(b); *Puente v. Puente*, No. 01-18-00583-CV, 2019 Tex. App. LEXIS 6494, at *12-13 (Tex. App.—Houston [1st Dist.] July 30, 2019, no pet.) (mem. op.);

6

*Wilkerson v. Wilkerson*, 321 S.W.3d 110, 117 (Tex. App.—Houston [1st Dist.] 2010, pet. dism'd). "Family violence," as defined in the Family Code, includes:

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault.

Tex. Fam. Code § 71.004(1). "Family" is defined to include individuals who are parents of the same child. *Id.* § 71.003.

The evidence in this record, viewed in the light most favorable to the trial court's finding, shows that Smuts publicly accosted Lydia in the clinic parking lot on August 13 and in the presence of the three children in the vehicle, including her own child; that she yelled profanities; that she grabbed the window to the vehicle and "shoved it back down" and that the vehicle drove off only when she backed away; that she nearly hit Franks's vehicle while speeding away to "tailgate" Lydia's vehicle; that she called Caracheo and Lydia while driving "very closely and aggressively" behind them and making "jerking motions" with her sedan; and that she expressed a desire to "put a bullet" in Caracheo and Lydia.

Franks testified that the sedan was driven in a "dangerous manner," that he was concerned for Lydia and the occupants of her vehicle, and that he "would definitely be in fear of [] getting into an accident if somebody was doing that to my vehicle behind me." Similarly, Caracheo testified that he was concerned about the way that Smuts was driving on August 13 based on her history of "six major accidents," most involving her "rear-ending" other people's vehicles. He also testified that Lydia was "intimidated" by Smuts's conduct on August 13 and that he was concerned about the gun threat. He noted that there are guns in Smuts's home and that Smuts's altercations have become increasingly aggressive over time. Likewise, Lydia feared

for herself and her family based on the gun threat and Smuts's willingness to risk an accident by driving dangerously while children were in the vehicle ahead of hers. Lydia also feared being shot or attacked by Smuts because of how "she came at me in my car." This was at least some evidence of family violence. *See Boyd*, 425 S.W.3d at 430 (concluding that evidence of person blocking car with his body to prevent woman from leaving and then jumping on its hood was legally sufficient evidence of family violence even without physical harm to woman); *Burt v. Francis*, 528 S.W.3d 549, 554 (Tex. App.—Eastland 2016, no pet.) (concluding that evidence of ex-husband's threats, including his intimidating posture while yelling, and his escalating conduct toward his ex-wife and children was legally sufficient evidence of family violence); *Culver v. Culver*, 360 S.W.3d 526, 533 (Tex. App.—Texarkana 2011, no pet.) (concluding that evidence that wife followed her husband in her car and tried to run him off road and came close to hitting him was some proof that she reasonably placed him in fear of imminent bodily injury or assault); *Clements v. Haskovec*, 251 S.W.3d 79, 85 (Tex. App.—Corpus Christi 2008, no pet.) (concluding that husband's act of raising fist and making other threats was sufficient to constitute "family violence" without him actually striking his daughter or wife); *see also Davis v. Sampson*, No. 01-10-00604-CV, 2011 Tex. App. LEXIS 9883, at *12-13 (Tex. App.—Houston [1st Dist.] Dec. 15, 2011, no pet.) (mem. op.) (noting that relevant inquiry is whether person's threats reasonably made another fear that physical harm was near at hand or about to happen). Thus, we conclude that the evidence here is legally sufficient to support the trial court's finding that Smuts had committed family violence.

Further, the trial court heard that August 13 "[wa]sn't the first time this has happened." During the thirteen years since Smuts and Caracheo divorced, particularly since his remarriage in February 2020, Smuts has exhibited increasingly aggressive and erratic behavior.

8

This evidence, considered with the evidence of past family violence, would allow a reasonable factfinder to conclude that future family violence is also likely. *See Puente*, 2019 Tex. App. LEXIS 6494, at *14; *Boyd*, 425 S.W.3d at 432 (concluding that evidence of single act of past family violence can be legally sufficient to support trial court's finding as to likelihood of future family violence). Thus, we conclude that the evidence is legally sufficient to support the trial court's finding that Smuts was likely to commit family violence in the future. *See Boyd*, 425 S.W.3d at 429, 432.

Moreover, review of this record overall shows that the trial court's findings as to past and future family violence are not against the great weight and preponderance of the evidence. *See Clements*, 251 S.W.3d at 86 (noting that there was "no evidence to the contrary because [opponent of protective order] did not offer any contradicting account of events"); *see also City of Keller*, 168 S.W.3d at 826; *In re Frasure*, 2015 Tex. App. LEXIS 1057, at *12. Thus, we conclude that the evidence is factually sufficient to support these family-violence findings. *See Puente*, 2019 Tex. App. LEXIS 6494, at *15. We overrule Smuts's first issue.

**In-chambers Interview of Child**

Next, Smuts contends that the trial court abused its discretion by granting Caracheo's "Motion to Have Child Interviewed by the Court" and by conducting that in-chambers interview. A timely request, objection, or motion is generally required to preserve a complaint for appellate review. *See* Tex. R. App. P. 33.1(a). Similarly, Texas courts have held that the failure to object to a trial court's interview of a child in custody and termination-of-parental-rights cases waives that complaint on appeal. *See, e.g., In re A.N.*, No. 10-16-00394 CV, 2017 Tex. App. LEXIS 8723, at *3 (Tex. App.—Waco Sept. 13, 2017, no

9

pet.) (mem. op.) (noting that party "did not object to the in-chamber interviews of the children at any point during the trial" and concluding that her appellate complaint about those interviews was waived); *In re M.J.P.*, No. 04-16-00124-CV, 2016 Tex. App. LEXIS 13192, at *37 (Tex. App.—San Antonio Dec. 14, 2016, no pet.) (mem. op.) (concluding that lack of objection to trial court conducting private interview with child waived appellate complaint on those grounds); *Ponder v. Rice*, 479 S.W.2d 90, 93 (Tex. Civ. App.—Dallas 1972, no writ) (holding that complaint about trial court's interview with minor child was waived by failure to object before interview was conducted).

This record shows that there was no objection to Caracheo's motion to interview the child before the interview occurred and no filing to set aside the trial court's order granting that motion.[4]  Rather, the trial court interviewed the child—without objection—on the morning of the hearing while the parties' attorneys conferred.  Because Smuts waived any error as to these complaints, we overrule her second and third issues.

**CONCLUSION**

We affirm the trial court's protective order.

_____
Gisela D. Triana, Justice

---

[4]  After the interview with the child occurred, Smuts filed a motion to recuse the trial-court judge.  That motion was referred to the Presiding Judge for the Third Administrative Judicial Region, assigned to an appointed judge, considered at an evidentiary hearing, and denied. *See* Tex. R. Civ. P. 18a.

10

Before Justices Goodwin, Triana, and Kelly

Affirmed

Filed:   August 25, 2021