**Opinion issued November 3, 2022**



**In The**

# Court of Appeals

**For The**

# First District of Texas

——————————

## NO. 01-22-00082-CV

——————————

**NICHOLAS NORTHFELL, Appellant**

**V.**

**TAYLOR NORTHFELL, Appellee**

---

**On Appeal from the 280th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-62671**

---

## MEMORANDUM OPINION

Appellant, Nicholas Northfell ("Nick"), challenges the trial court's issuance

of a final protective order prohibiting him from, among other things, committing

family violence against appellee, Taylor Northfell, and their three minor children.

In his sole issue, Nick contends that the evidence is legally insufficient to support the trial court's issuance of the protective order.

We affirm.

## Background

On September 28, 2021, Taylor filed an application for a protective order against her husband, Nick, alleging that he had "engaged in conduct that constitutes family violence" and had "committed acts that were intended . . . to result in physical harm, bodily injury, assault, or sexual assault or were threats that reasonably placed [Taylor] in fear of imminent physical harm, bodily injury, assault, or sexual assault." Taylor further alleged that Nick had engaged in conduct "reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass" her and their children.

In her attached affidavit, Taylor testified that she and Nick had been married since 2014 and had three children, ages two, six, and eight. She testified:

> Nick loses control of his temper and becomes physically violent when he is angry. The problems becomes much worse when he is drunk. Nick drinks in excess, even when in the presence of our children. Nick needs to stop drinking and get his anger under control and without the assistance of this court this will never happen. I am afraid for myself and for our children.

On October 11, 2016, Nick became "extremely intoxicated" at a friend's wedding rehearsal dinner. Taylor testified that she:

> tried to persuade Nick to leave the party because he was so drunk. When I was able to get him outside, he push[ed] me down the stairs. After that, I asked my brother to help me carry him on to the bus

2

because he had passed out. When he woke up, he thought he had urinated on himself and was embarrassed and began to berate me and spit on me. My father had to take him home in a taxi.

Taylor also testified that, at home during the fall of 2016, Nick was "drunk" and "kept trying to force himself on" her. She "repeatedly told him to stop, but he refused and [she] could not escape." Nick "pushed [her] over the stove in the kitchen and forced [her] to have intercourse against [her] will."

Taylor further testified that, on the night of September 26, 2021, Nick was intoxicated, and she locked herself in her bedroom. Nick banged on her bedroom door and yelled at her to open it. When she refused, he broke through the door, damaging the frame. He grabbed Taylor's arm and held her as she tried to crawl away. When their daughter began crying nearby, Nick released Taylor, but "grabbed" their daughter and held her as he continued to yell at Taylor. When Taylor escaped to the kitchen, Nick pursued her, while still holding their daughter. He later went to Taylor's bedroom, "threw her suitcase into the living room," and pushed Taylor out the front door of the house. Taylor testified that she left because she was afraid of Nick. The next day, Nick did not return her messages, and she learned that he did not take the children to school. She was frightened and called the police.

After a hearing, the trial court issued a temporary ex parte order and set a hearing on the application.[1] Nick answered, denying the allegations.

---

[1] *See* TEX. FAM. CODE § 83.001.

At the hearing on the application, at which Taylor and Nick appeared with counsel, the trial court admitted into evidence Taylor's application, supporting affidavit, and the temporary order. At the hearing, Taylor testified in further detail about the events at issue. She again noted that she and Nick had been married since 2014 and had three children, ages two, six, and eight. She testified: "I think he [has drunk] every single day that I've known him." She had seen him "almost finish" a "fifth" of vodka in four or five hours[2] and had "never seen him stop drinking for maybe more than a couple days." She stated that he "gets violent when he's drinking."

Taylor testified that, in 2016, at a friend's wedding rehearsal dinner in Guadalajara, Mexico, Nick became so intoxicated that he was "incoherent" and "falling over at the table." When Taylor tried to get him to leave, he got mad and pushed her down a flight of steps and onto the ground, injuring her back. He also "passed out" in the grass. Taylor's brother got Nick to a shuttle bus and laid him across the back seats. When he awoke, Nick thought he had urinated on himself, was embarrassed, and spat at Taylor. Taylor's father intervened.

At home during the fall of 2016, Nick had been drinking and "forced himself on [Taylor] over the stove in [their] kitchen," and she was unable to free herself. She

---

[2] A "fifth" is a unit of volume formerly used for distilled beverages that is equal to one fifth of a gallon. *See Bates v. State*, 494 S.W.3d 256, 262 n.1 (Tex. App.—Texarkana 2015, pet. ref'd).

testified that, although she "said no to him the whole entire time," he "pushed [her] over the stove" and "just had sex with [her] anyways."

Taylor also testified that, in 2019, Nick was intoxicated, got into an auto collision, and left the scene, as follows:

A. [Nick] had gone out to a bar and came home completely trashed. And the next day I had to go to work and I went to work, but I just felt like something was off, so I called my boss and I told her I just couldn't go in. And I had drove back home and he had parked his car in front of our house, which I found to be weird. And I just drove passed it and I noticed that the front end has been smashed in.

Q. When you say he was trashed the night before, what did you mean by that?

A. Like he came home, I would say in a blackout state.

Q. When—so what happened after you saw the front of the car?

A. I went inside and I asked him what happened and he had no idea.

Q. Okay. Did he eventually tell you anything about what happened?

A. He says he think[s] he hit a green pick-up truck. He doesn't really remember.

Q. How did he refer to that incident?

A. Like—

Q. What did he call it?

A. He did a hit and run.

Q. Okay. And what concerns did you have when he said that?

A. I asked him, I was like, what if you hurt somebody. I mean he could have killed somebody. I don't know.

Taylor noted that, during that same "bender," which went on for "at least three" days, Nick said that he wanted to kill himself and "smashed a beer bottle over

his own head." There was "glass everywhere," "he was profusely bleeding from his forehead," and there was blood all over the patio and carpeting of their house.

On September 26, 2021, when Taylor arrived home at around 8:00 p.m., she saw that Nick was intoxicated. He was talking to himself and being loud and erratic. Taylor noted that, during the previous two months, at her request, she had been sleeping in the master bedroom and Nick had been sleeping in a guest room. She went into her bedroom and closed the door and locked it. Her two older children were asleep upstairs and her two-year-old daughter was sleeping on a couch "[r]ight outside" the master bedroom door.

Taylor testified that Nick went outside and peered into her bedroom window at her. He then came back inside and tried to get into her bedroom. He eventually "broke into [her] bedroom and broke the door off the frame." The trial court admitted into evidence a series of video clips, with audio, taken from Taylor's phone, including a clip of Nick yelling and cursing at Taylor through the bedroom door, banging on the door, and demanding to be let into the room, with Taylor pleading that he leave her alone, and a clip of Nick breaking through the door.

Taylor testified that, when Nick entered her room, he grabbed her by her left arm, pulling her from the bed and trying to take her phone from her hand. She "tried to scramble to the other side of the bed" and their daughter, who had been sleeping on the couch outside her bedroom, woke up and began crying. The family dog was

also on the bed.  Taylor testified that Nick released her arm, picked up the crying child, and demanded that Taylor leave the house.  The trial court admitted a clip of Nick lunging at Taylor and reaching toward her and a clip of Nick holding their child and demanding that Taylor leave the house.  The trial court also admitted photographs of the broken door and Taylor's arm.

Taylor testified that she got dressed and tried to leave, but that Nick blocked the doorway with his body.  Once she got through, Nick followed her to the kitchen, where he grabbed her hand and tried to take her phone by "crushing" her hand and "banging it up against the wall."  Nick eventually let her go and went to her bedroom and took her suitcase, still packed from visiting her brother the weekend before, and threw it into the living room.  When Taylor picked up her suitcase, Nick pushed her through the front door.  Taylor noted: "He told me that I better get my effing dog too and then I couldn't get her.  And so when he shut the door, I kind of remember myself just yelling for him not to hurt her."  But, Nick "wouldn't answer."

Taylor further testified:

A. Well the next day, he wouldn't answer the phone.  I had tried to call him.  I had had my mom try to call him, my brother try to call him. I called the schools.  He didn't take the kids to the school.

Q. When you left the house, where were the children?

A. They were still inside.

Q. Okay.  And why did you leave them there?

A. Because I was afraid if I stayed they would get hurt.

7

Q. And so you went to your brother's house. And then when is the next time you saw him, if you did?

A. Next day.

Q. What happened then?

A. That's when we tried to get a hold of him and we couldn't get—he wouldn't answer our phone calls and he had kept the kids home from school.

Q. Okay. What concerns did you have about that?

A. Honestly, I was kind of afraid that he had killed himself or something or hurt the kids.

Q. Has he ever threatened to kill himself before?

A. Yes.

Taylor testified that Nick verbally abuses her in front of the children, that he has punched holes in the walls in their house, and that she has had to take the children upstairs because Nick was smashing furniture. She further testified that Nick was "really mean" to the family dog, "Sandy," and that Sandy was scared to go near him because he yelled at her and hit her. She noted that Nick had left the children alone in the swimming pool in their backyard while he was drinking at a neighbor's house.

Nick testified: "I probably drink four times a week, five times a week." He noted that, "on an average day," he drinks "maybe a few beers," but that, "on occasion," he drinks "twelve or more beers in a day" and drinks vodka.

He admitted that he had been drinking at the rehearsal dinner on October 11, 2016. He testified, however, that he was "fine" and "just sitting at the table." He asserted that Taylor made him get on the bus without cause and that he eventually

walked outside and got on the bus. He noted that there were no stairs outside and that he did not recall falling down.

Nick admitted having engaged in sexual intercourse with Taylor "many times" while he was intoxicated but denied that he had ever assaulted her. With respect to Taylor's testimony about the 2016 sexual assault, Nick testified that he recalled the "act" but "never recalled her saying no to [him]."

Nick admitted that he had "smashed" a "glass cup" on his head, but denied that he had been drinking or that he was trying to kill himself. He asserted, rather, that he had lost control of his "emotions."

He admitted that he had wrecked his car in 2019, but denied that he was intoxicated. He testified that "somebody in front of [him] stopped in their lane" and that he hit them, but that they had left the scene. He did not report the matter to the police or to his insurance company.

Nick admitted that he had been drinking on September 26, 2021, but denied that he was intoxicated. He testified that Taylor came home at around 8:00 p.m. and went into her bedroom. Minutes later, he heard her lock the door. He admitted that he "got up and went outside and was looking through the window" at her. He believed that Taylor had been unfaithful and that she was "sending pictures of herself to other guys." He knocked on the door and said that they needed to talk. He testified that, when Taylor refused, he broke through the door because "she was avoiding the

9

situation." He admitted that, when he saw Taylor filming him, he "reached and grabbed the phone from her." He testified that she followed him into the kitchen and tried to retrieve it from him. While they were screaming at each other, their youngest daughter, who was asleep on a nearby couch, woke up and started crying. Nick returned Taylor's phone to her, went and picked up the child, and followed Taylor back into her bedroom. He admitted that, while still holding their daughter, he called Taylor a "f*ing asshole" and yelled at her to "leave the f*ing house." He stated that Taylor then packed and went to her brother's house.

Nick denied that his conduct was a product of intoxication, but asserted that he was angry and that Taylor had provoked him. He admitted that he had put his fists through the sheetrock walls in the garage, but asserted that they were "redoing the garage walls." He denied breaking furniture in the house, denied that he is a danger to his children, and denied having ever left them alone in a swimming pool.

On January 11, 2022, the trial court issued an "Amended Final Protective Order," stating:

> The Court finds that Applicant, [Taylor] and Respondent, [Nick] are married and have three (3) children . . . .
>
> *The Court finds that family violence has occurred and that family violence is likely to occur in the future.* The Court finds that Respondent, [Nick], has committed family violence. The Court finds that there are reasonable grounds to believe that Applicant was a victim of a sexual assault under Texas Penal Code 22.011 and Chapter 7(B) of the Texas Code of Criminal Procedure. The Court finds that the following protective orders are for the safety and welfare and in the best

10

interest of Applicant and other members of the family and household and are necessary for the prevention of family violence. The Court finds that good cause [exists] to prohibit Respondent from communicating in any manner with Applicant, or any Protected Person, except through Respondent's attorney or a person appointed by the Court, with the exception of communications regarding the minor children . . . , which will be restricted to Our Family Wizard.

(Emphasis added.)

In its order, the trial court identified Taylor and each of the children as a "Protected Person" and decreed that Nick was:

1.    Prohibited from committing family violence; mental and emotional injury; physical injury; . . . .

2.    Prohibited from doing any act that is intended to result in physical harm, bodily injury, assault, or sexual assault against any Protected Person.

3.    Prohibited from doing any act that is a threat that reasonably places any Protected Person in fear of imminent physical harm, bodily injury, assault, or sexual assault.

4.    Prohibited from committing abuse of a child of the family or household . . . .

5.    Prohibited from communicating directly with any Protected Person in a threatening or harassing manner.

6.    Prohibited from communicating a threat through any person to any Protected Person.

7.    Prohibited, on the basis of good cause shown, from communicating in any manner with any Protected Person except through Respondent's attorney or a person appointed by the Court, unless Respondent is exercising court ordered possession and access.

8. Prohibited from engaging in conduct directed specifically toward any Protected Person, including following the Protected Person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the Protected Person.

9. Prohibited from going to or near, or within 200 yards of, any location where any Protected [P]erson is known by Respondent to be and further prohibited from remaining within 200 yards after Respondent becomes aware of the Protected Person's presence, unless Respondent is exercising court ordered possession and access.

10. Prohibited from going to or near the residence or place of employment or business of any Protected Person. Respondent is prohibited from going to or near Applicant's residence . . . and Applicant's place of employment . . , and is specifically ORDERED to maintain 200 yards therefrom, unless Respondent is exercising court ordered possession and access.

11. Prohibited from going to or near the residence, childcare facilities, or schools [the children] normally attend[] or in which [the children] normally reside[].  Respondent is prohibited from going to or near [specified locations]. Respondent is further prohibited from going to or near the children's residence . . . and is specifically ORDERED to maintain 200 yards therefrom the schools and residence, unless Respondent is exercising court ordered possession and access.

12. Prohibited from removing [the children] from the possession of [Taylor], unless Respondent is exercising court ordered possession and access.

13. Prohibited from harming, threatening, or interfering with the care, custody, or control of a pet . . . that is possessed by or in the actual or constructive care of any Protected Person.

14. Prohibited from transferring, encumbering, or otherwise disposing of property mutually owned or leased by Applicant and Respondent, except when in the ordinary course of business.

15. Prohibited from possessing a firearm or ammunition . . . .

16. Prohibited from interfering with Applicant's use of the residence . . . , including but not limited to disconnecting utilities or telephone service or causing such services to be disconnected.

In its order, the trial court granted Taylor exclusive use and possession of the residence and ordered that Nick pay temporary spousal support. In addition, it granted Taylor exclusive possession of the children and ordered that Nick pay child support. The trial court granted Nick electronic access to the children, ordered that he complete a Battering Intervention and Prevention Program, parenting course, and substance-abuse evaluation, and stated that it would consider granting Nick possession and access to the children after a Compliance Hearing.

The trial court further found that

> there are reasonable grounds to believe that [Taylor] was a victim of sexual assault under the Penal Code 22.011 and Chapter 7(B) of the Code of Criminal Procedure. The Court therefore finds that the Court may grant a protective order for a period that is longer than [a] two-year period.

> IT IS THEREFORE ORDERED that this Order shall continue in full force and effect for the protection of [Taylor] for the next sixteen (16) years, or until December 6, 2037.

> IT IS FURTHER ORDERED that this order shall continue in full force and effect for the protection of [the children] until December 6, 2026.

### Legal Sufficiency of the Evidence

In his sole issue, Nick challenges the legal sufficiency of the evidence supporting the trial court's finding that "family violence is likely to occur in the future."

13

***Standard of Review***

We review the sufficiency of the evidence supporting a trial court's findings in a protective order under the same standards that we apply in reviewing jury findings. *Teel v. Shifflett*, 309 S.W.3d 597, 604 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). When, as here, an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id*. at 822.

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. at 819. Thus, it may choose to believe one witness and to disbelieve another and may resolve any conflicts in the evidence. *See id*. 819–20.

*Applicable Law*

The Texas Family Code defines "family violence" as:

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault . . . .

TEX. FAM. CODE § 71.004(1).

Family Code section 81.001 provides that a trial court "shall render a protective order as provided by Section 85.001(b) if the court finds that family violence has occurred and is likely to occur in the future." *Id.* § 81.001. Section 85.001 provides:

(a)     At the close of a hearing on an application for a protective order, the court shall find whether:

(1)     family violence has occurred; and

(2)     family violence is likely to occur in the future.

(b)     If the court finds that family violence has occurred and that family violence is likely to occur in the future, the court:

(1)     shall render a protective order as provided by Section 85.022 applying only to a person found to have committed family violence; and

(2)     may render a protective order as provided by Section 85.021 applying to both parties that is in the best interest of the person protected by the order or member of the family or household of the person protected by the order.

(c)     A protective order that requires the first applicant to do or refrain from doing an act under Section 85.022 shall include a finding that the first applicant has committed family violence and is likely to commit family violence in the future.

15

> (d)     If the court renders a protective order for a period of more than two years, the court must include in the order a finding described by Section 85.025(a-1).

*Id.* § 85.001; *see also id.* §§ 85.021 (governing contents of protective order applying to any party), 85.022 (governing contents of protective order applying to person who committed family violence).  A trial court may issue a protective order for a period exceeding two years if it finds that "the person who is the subject of the protective order" "committed an act constituting a felony offense involving family violence against the applicant . . . , *regardless of whether the person has been charged with or convicted of the offense.*"  *Id.* § 85.025(a-1)(1) (emphasis added).

***Discussion***

Here, the trial court's order states that it found (1) that "family violence has occurred" and (2) that "family violence is likely to occur in the future."  *See id.* §§ 81.001, 85.001(a).  The trial court found that

> Respondent, [Nick], has committed family violence.  The Court finds that there are reasonable grounds to believe that Applicant was a victim of a sexual assault under Texas Penal Code 22.011 . . . ."

A person commits the second-degree felony offense of sexual assault if he "intentionally or knowingly" "causes the penetration of the . . . sexual organ of another person by any means, without that person's consent."  TEX. PENAL CODE § 22.011(a)(1)(A), (f).  "A sexual assault under Subsection (a)(1) is without the

16

consent of the other person if: . . . the actor compels the other person to submit or participate by the use of physical force, violence, or coercion." *Id.* § 22.011(b)(1).

The record shows that Taylor testified that, on an occasion that occurred at their home during the fall of 2016, Nick had been drinking and "forced himself on [Taylor] over the stove in [their] kitchen," and she was unable to free herself. Although she "said no to him the whole entire time," he "pushed [her] over the stove" and "just had sex with [her] anyways." *See id.* § 22.011(a)(1)(A), (b)(1). Nick testified that he recalled the "act" but "never recalled her saying no." The trial court, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, chose to credit Taylor's testimony and to discredit that of Nick. *See City of Keller*, 168 S.W.3d at 819. The evidence is legally sufficient to support the trial court's finding that Nick committed sexual assault. *See, e.g.*, *Edoh v. State*, 245 S.W.3d 606, 609 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Under the Family Code, "family violence" includes an act of sexual assault by a family member against another family member. *See* TEX. FAM. CODE § 71.004(1). Thus, the evidence is likewise legally sufficient to support the trial court's finding that Nick "has committed family violence." *See id.* §§ 81.001, 85.001(a)(1). On appeal, Nick does not challenge this finding.

Rather, Nick challenges the legal sufficiency of the evidence supporting the trial court's finding that "family violence is likely to occur in the future." *See id.*

17

§§ 81.001, 85.001(a)(2). "[A] single act of family violence supports a finding that [the actor] is likely to engage in future family violence." *Vinzant v. Helduser*, No. 01-21-00633-CV, 2022 WL 3588756, at *7 (Tex. App.—Houston [1st Dist.] Aug. 23, 2022, no pet.) (mem. op.); *Boyd v. Palmore*, 425 S.W.3d 425, 432 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("The statutory language . . . does not require that a likelihood finding be based on more than one act of family violence."). In addition, in cases involving protective orders against family violence, evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue this behavior in the future. *Lewis v. Yancy*, No. 01-19-00348-CV, 2020 WL 7251448, at *5 (Tex. App.—Houston [1st Dist.] Dec. 10, 2020, no pet.) (mem. op.); *Teel*, 309 S.W.3d at 604 ("The trial court reasonably could have concluded that future violence is likely to occur based on the testimony showing a pattern of violent behavior.").

Here, the evidence shows that Nick not only committed an act constituting a felony offense involving family violence against Taylor, but also, as discussed above, that he engaged in a pattern of violent conduct throughout their marriage. Thus, there is more than a scintilla of evidence supporting the trial court's finding that Nick is likely to engage in family violence in the future, and the evidence is legally sufficient to support the trial court's finding. *See* TEX. FAM. CODE §§ 81.001, 85.001(a)(2); *Vinzant*, 2022 WL 3588756, at *7 ("Vinzant's commission of a felony

offense involving family violence on June 10, 2021 permits a finding that he is likely to engage in future family violence."); *Boyd*, 425 S.W.3d at 432 ("Boyd's commission of an act of family violence during the October 2009 incident would permit a finding that he was likely to engage in future family violence."); *Teel*, 309 S.W.3d at 604; *see also City of Keller*, 168 S.W.3d at 810.

Nick asserts that the 2016 sexual assault is too remote in time to support the trial court's finding. However, "[n]othing in the statute places a time constraint on the acts of family violence that a trial court can consider when presented with an application for a protective order." *Caballero v. Caballero*, No. 14-16-00513-CV, 2017 WL 6374724, at *4 (Tex. App.—Houston [14th Dist.] Dec. 14, 2017, no pet.) (mem. op.); *see Wilkerson v. Wilkerson*, 321 S.W.3d 110, 117–18, 121 (Tex. App.—Houston [1st Dist.] 2010, pet. dism'd) (finding likelihood of future family violence based on threats of physical harm occurring six years prior to application for protective order); *see also Kuzbary v. Kuzbary*, No. 01-14-00457-CV, 2015 WL 1735493, at *5 (Tex. App.—Houston [1st Dist.] Apr. 14, 2015, no pet.) (mem. op.) (holding that acts of family violence that occurred two to four years before application for protective order not too remote to support issuance of order).

Because the trial court's findings are supported by legally sufficient evidence, we hold that the trial court did not err in issuing its protective order. *See* TEX. FAM. CODE §§ 81.001, 85.001.

19

We overrule Nick's sole issue.

## Conclusion

We affirm the trial court's "Amended Final Protective Order."

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.